# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-02297-NYW

IRA S. JAFFREY, M.D.,

    Plaintiff,

v.

PORTERCARE ADVENTIST HEALTH SYSTEM,

    Defendant.

---

## ORDER ON MOTION TO EXCLUDE TESTIMONY OF JEFFREY BAUER

---

Magistrate Judge Nina Y. Wang

    This matter is before the court on Defendant PorterCare Adventist Health System's ("Defendant" or "PorterCare") Motion to Exclude Testimony of Jeffrey Bauer ("Motion to Exclude" or "Motion") [#70, filed August 10, 2017]. The Motion is before the undersigned pursuant to 28 U.S.C. § 636(c) and the Order of Reference dated December 9, 2015. [#11].[1] The court has reviewed the Motion to Exclude and the respective briefing, the entire docket, and the applicable case law. In addition, the court held an evidentiary hearing on November 15, 2017, including oral argument. Accordingly, for the reasons set forth below, the court respectfully GRANTS IN PART and DENIES IN PART the Motion to Exclude.

## BACKGROUND

    The court has discussed in detail this action's background in previous rulings, *see, e.g.*, [#46], and discusses it here only as it pertains to the pending Motion. Plaintiff Ira S. Jaffrey

---

[1] In citing documents on the electronic docket, this court uses the convention [#__] to refer to the particular docket entry and refers to the page number assigned by the court's Electronic Court Filing ("ECF") system.

("Plaintiff" or "Dr. Jaffrey") initiated this action on October 16, 2015, at the age of seventy-six (76). [#1]. Plaintiff, a Colorado licensed physician and board certified oncologist, began working as a part-time ("*locum tenens*") oncologist at Defendant's facility, Mile High Oncology ("MHO"), in April 2014. [*Id.* at ¶¶ 4, 9]. During his *locum tenens* tenure, Dr. Jaffrey and PorterCare began discussing a contract position whereby he would work at MHO as an employee of the practice. The Parties vigorously dispute what happened next but, ultimately, Plaintiff ceased working at MHO on or about July 24, 2014. [*Id.* at ¶¶ 5–11]. Plaintiff alleged that Defendant discriminated against him because of his age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA" or "Act"), 29 U.S.C. § 621 *et seq.* (Claim I). [*Id.* at ¶ 1, 20]. Plaintiff also brought common-law claims for breach of contract (Claim II) and promissory estoppel (Claim III) against Defendant. [*Id.* at ¶¶ 21–24].

On September 9, 2016, Defendant filed its Motion for Summary Judgment. [#31]. After briefing and argument, the court granted in part and denied in part Defendant's Motion for Summary Judgment. [#46]. Specifically, the court held that genuine issues of material fact precluded summary judgment as to Claims I and III, and granted summary judgment in Defendant's favor as to Claim II only to the extent it alleged a breach of contract claim predicated on the unsigned employment agreement. [*Id.*]. Thus, Claims I and III remained in their entirety for trial, and Claim II remained to the extent it alleged a breach of contract claim predicated on the breach of an oral promise to extend Plaintiff's *locum tenens* employment with Defendant. [*Id.*]. The court then denied Defendant's Motion to Reconsider on August 10, 2017. [#69].

In anticipation of the trial set to commence on February 26, 2018, Defendant filed the instant Motion to Exclude. Plaintiff filed his Response [#73], and Defendant filed its Reply

[#74]. The court held an evidentiary hearing on November 15, 2017, at which the Parties were permitted to examine Jeffrey Bauer, PhD ("Dr. Bauer") as well as Defendant's expert, George Rhodes, PhD ("Dr. Rhodes"), and present oral argument. [#80]. Being fully advised of the premises, the court now turns to considering whether some or all of the opinions offered by Dr. Bauer identified in the Motion should be excluded pursuant to Rule 702 of the Federal Rules of Evidence, *Daubert v. Merrell Dow Pharmaceuticals*, and their progeny.

## LEGAL STANDARDS

Rule 702 of the Federal Rules of Evidence permits:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As noted by the Advisory Committee when the Rule was promulgated, "[a]n intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical, or other specialized knowledge." Fed. R. Evid. 702 advisory committee's note to 1937 rule.

It is well established that trial courts are charged with the responsibility of acting as gatekeepers of expert testimony to ensure that expert testimony or evidence admitted is not only relevant, but also reliable. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–152 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588–89 (1993). To fulfill that gatekeeper function, courts within the United States Court of Appeals for the Tenth Circuit

3

("Tenth Circuit") conduct a two-part inquiry. First, this court considers whether the expert's proffered testimony has a reliable basis in the knowledge and experience of his or her discipline by conducting a preliminary inquiry into the expert's qualifications and the admissibility of the proffered evidence, i.e., whether the reasoning or methodology underlying the testimony is valid. *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006) (citing *Butler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232–33 (10th Cir. 2004)). Second, the court considers whether the proposed testimony is sufficiently relevant to the issues presented to the factfinder. *See id.* The party offering the expert opinion bears the burden of establishing its admissibility, including the foundational requirements by a preponderance of the evidence. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009); *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008).

"Generally, the district court should focus on an expert's methodology rather than the conclusions it generates." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003). To that end, courts consider the following non-exhaustive factors in analyzing whether a particular expert opinion meets the requirements of Rule 702, *Daubert*, and their progeny:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

*Id.* The court's analysis is opinion-centric, rather than expert-centric. *See United States v. Nacchio*, 608 F. Supp. 2d 1237, 1251 (D. Colo. 2009).

Neither the Federal Rules of Evidence nor the Federal Rules of Civil Procedure define the procedure by which this court discharges its duties as a gatekeeper, and the trial court's discretion in admitting or excluding evidence under *Daubert* is broad. *Dodge*, 328 F.3d at 1223.

4

If a party challenges the foundational sufficiency of an expert's opinion, the court must make factual findings, preferably after an evidentiary hearing. *Id.*; *but cf. United States v. Chapman*, 839 F.3d 1232, 1239 (10th Cir. 2016) ("Tenth Circuit case law does not mandate that a hearing be held." (citation and quotation marks omitted)). But in the context of such hearing, the court focuses on principles and methodology, not the conclusions generated or their weight or persuasiveness. *Daubert*, 509 U.S. at 595; *Crabbe*, 556 F. Supp. 2d at 1220.

## ANALYSIS

In its Motion to Exclude, Defendant asserts that Dr. Bauer's opinions, as reflected in his expert report, are flawed in several different ways. First, Defendant contends that Dr. Bauer's calculation of back pay damages is flawed because it fails to account for any mitigation of damages and includes productivity incentives. [#70 at 2–6]. Defendant also takes issue with Dr. Bauer's application of inconsistent interest rates for the purposes of back pay and front pay. [*Id.* at 6–8]. Next, Defendant argues that Dr. Bauer's statements about consequential harms to Dr. Jaffrey exceed the scope of his expertise, and that Dr. Bauer's opinion of the applicable hourly wage for a consulting physician lacked foundation. [*Id.* at 8–11]. Finally, Defendant contends that Dr. Bauer's opinions that PorterCare reduced the compensation plan offered to Dr. Jaffrey was reduced by 10% due to age discrimination. [*Id.* at 11]. The court addresses each in turn.

I. **Calculation of Back Pay Damages**

In Section 1 of his report, Dr. Bauer addresses Dr. Jaffrey's loss of income for the anticipated term of a two-year contract from July 2014 to May 2016. [#70-1 at 2]. PorterCare concedes that Dr. Bauer understood the proper methodology for calculating damages during the life of the contract, i.e., looking to "what a person would have earned under a certain circumstance and compare that to what he did or could have earned." [#70 at 2 (citation and

quotation marks omitted)]. Nevertheless, PorterCare argues that, despite understanding the proper methodology, Dr. Bauer failed to apply it by omitting any mitigation of damages and including a performance bonus for which Dr. Jaffrey testified at deposition he was not anticipating. [*Id.* at 2–3]. Defendant also seeks to preclude Dr. Bauer's calculation of damages based on his inconsistent application of interest rates to discounting future earnings versus lost wages. [*Id.* at 6–8].

During the evidentiary hearing, Plaintiff presented Dr. Bauer to explain the methodology of his calculation of back pay and the factual data upon which he relied. Dr. Bauer testified that he did not deduct any amounts earned by Dr. Jaffrey because he was not aware of any actual earnings, that he did not think it was appropriate to project any potential earnings because the time period for back pay was almost closed by the time of his retention, and that it was more accurate to reflect Dr. Jaffrey's lack of relevant work during this period.[2] *See also* [#73-1 at ¶ 5]. As to the productivity bonus, Dr. Bauer testified that he interpreted the correspondence between decisionmakers at PorterCare as indicating that Dr. Jaffrey was not only eligible for earning the productivity bonus but also should reasonably expect to earn it so long as he met certain metrics. To that end, Plaintiff introduced in evidence a document entitled the Centura Health Physician Group Compensation Model – FY15 that Dr. Bauer testified was the basis for his determination that, if Dr. Jaffrey met the annual 3,100 wRVU level, he would earn an additional $28,086 in

---

[2] During the hearing, Dr. Bauer and Plaintiff's counsel conceded that Dr. Jaffrey did, in fact, earn income between July 2014 and May 2016 that was not reflected in his calculation of back pay damages. In his Declaration in support of the Response to the Motion to Exclude, Dr. Bauer also conceded, "[t]o the extent that any of the $63,529.50 outlined in the document from Dr. Jaffrey's former attorneys is from professional practice as an oncologist, I would likely agree that the amount(s) should be deducted from the value of damages presented in my report." [#73-1 at ¶ 6]. Because Dr. Bauer had not yet supplemented any expert opinion, this court did not permit any additional testimony as to that issue as a Rule 702 evidentiary hearing is not the proper mechanism for a party to supplement its expert disclosures pursuant to Rule 26(e) of the Federal Rules of Civil Procedure.

incentive pay. [#73-2]. Dr. Bauer further testified that, based on his conversations with Dr. Jaffrey, he understood that Dr. Jaffrey anticipated that he would meet such metrics. *See also* [#73-1 at ¶ 9]. Finally, Dr. Bauer testified that he applied a 5% interest rate to back pay damages because it was consistent with the interest rate that would have been applicable to any amounts owed by Dr. Jaffrey to PorterCare under the Physician Employment Agreement [#73-3], and was an approximate mid-point between the different interest rates, including rates from the Federal Reserve, the United States banking system, and the financial markets, as some economists, particularly in Europe, are currently using zero or negative interest rates. *See also* [#73-1 at ¶ 13]. On cross-examination, Dr. Bauer admitted that he had no historical data to prove that Dr. Jaffrey would meet the metrics to qualify for a bonus, but that Dr. Jaffrey had told him during their conversations that he was confident he would receive such bonus.

Defendant offered Dr. Rhodes, who testified that it was standard practice for forensic economists to subtract not only actually earned income but also any potential income when calculating back pay. Consistent with his Report [#70-3], Dr. Rhodes testified that he relied upon the report of a vocational expert, Janet Toney [#70-8], for the assumption that Dr. Jaffrey was employable during the back pay period and that Dr. Bauer's opinion was unreliable for failure to include any amount for mitigation—either from actual earnings or from potential earnings. Dr. Rhodes was further critical of the inclusion of any incentive bonus in the back pay calculation, pointing to Dr. Jaffrey's deposition testimony that the Parties had not agreed to any incentive bonus as part of any proposed compensation plan. Finally, Dr. Rhodes testified that the Physician Employment Agreement was not an appropriate source for a 5% interest rate for back pay damages, particularly in light of no discount of any front pay. On cross-examination, Dr. Rhodes could not specifically identify a learned treatise or article that required the inclusion of

potential mitigation in any calculation of back pay but, rather, he testified that, based on his decades of experience as a forensic economist and professor, the framework was standard and "common sense."

Based on the record before it, the court finds as follows. Despite the Parties' various arguments at the evidentiary hearing regarding the appropriate "methodology," there is no material dispute as to the methodology to be applied in calculating past damages. Indeed, despite PorterCare's characterization of Dr. Bauer's methodology as not reliable, it admits that Dr. Bauer understood the "formula for calculating damages." [#70 at 2–3]. The Parties agreed that the first step in calculating back pay damages is determining what plaintiff would have earned without the alleged adverse employment action. The Parties also agreed that any actual earnings by Plaintiff should be deducted from that amount. Defendant's true criticism of Dr. Bauer's opinions, and the core of the Parties' dispute over it, lies with the inputs that he included (i.e., productivity bonus and interest rate to future economic damages) and failed to include (i.e., mitigation and interest rate to past economic damages) in his calculation. [*Id.* at 3–6]. Even accepting that the Parties have a dispute over the proper methodology (instead of simply inputs), Rule 702 "is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise." Fed. R. Evid. 702 advisory committee's note to 2000 amendment (citing *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 160 (3d Cir. 1999) (expert testimony cannot be excluded simply because the expert uses one test rather than another, when both tests are accepted in the field and both reach reliable results)).

Nor does Rule 702 require the expert's opinion to be correct. Rather, Rule 702 requires the proponent of the expert opinion to establish: (1) the expert has sufficient qualifications; (2) the expert employs reliable principles and methodologies to form the opinion; (3) the expert

obtains sufficient facts and data; and (4) the expert reliably applied the methodology to the facts and data. *See Nacchio*, 555 F.3d at 1241. Applying these factors, this court concludes that Dr. Bauer's challenged opinions regarding the calculations regarding back pay are sufficiently reliable under Rule 702.

Dr. Bauer testified that he relied upon his knowledge (at the time) that Dr. Jaffrey had not engaged in any *locum tenens* work between July 2014 and May 2016. Dr. Bauer issued his report on May 17, 2016 [#70-1 at 2], and, as he noted, at that time, any period for pay under the purported contract was closing. The fact that Dr. Bauer did not separately calculate what Dr. Jaffrey could or should have made—in light of information of actual earnings—does not render his calculations unreliable for the purposes of Rule 702. Certainly, the court and the jury can understand and replicate his decision not to include any additional amount for mitigation.

The court reaches a similar conclusion regarding Dr. Bauer's assumption that an incentive bonus can be included as part of back pay. As set forth above, Plaintiff bears the burden of establishing its admissibility, including the foundational requirements. *Nacchio*, 555 F.3d at 1241; *Crabbe*, 556 F. Supp. 2d at 1220. In his Report, Dr. Bauer indicated that he used the wRVU units that Defendant used to calculate his base salary, and translated it to a "quality incentive." [#70-1 at 3]. While the Parties dispute whether Dr. Jaffrey was eligible for such incentive bonus, or would earn such a bonus, Dr. Bauer testified that he relied upon Dr. Jaffrey's statements to him that Dr. Jaffrey was confident he would qualify for the bonus. Rule 703 of the Federal Rules of Evidence expressly permits Dr. Bauer to rely on facts or data that would otherwise be inadmissible,[3] and Dr. Jaffrey's deposition testimony, though certainly testing Dr. Bauer's assumption, does not necessarily invalidate it.

---

[3] The Parties should not interpret this ruling as one of admissibility of Dr. Jaffrey's out of court statements regarding his ability to qualify for and earn a productivity bonus. Rule 703 clearly

Likewise, PorterCare's criticism of Dr. Bauer's application of particular interest rates is not directed at the methodology Dr. Bauer used. In fact, Defendant acknowledges, "Bauer admirably explained why economists discount future earnings to present value when calculating damages from lost income." [#70 at 6]. Instead, Defendant takes issue with the particular rate Dr. Bauer utilized in drawing this conclusion, a rate drawn from the standard Physician Employment Agreement and as a "mid-point" of other global interest rates. [#73-1 at ¶¶ 12, 13]. Again, this objection is not one directed at methodology—the experts and Parties agree that back pay losses and front pay losses may be subject to interest rates to account for the time value of money. The Parties simply vigorously disagree as to what the applicable rates should be.

Ultimately, the fact that Defendant's expert believes other assumptions should be made regarding the potential mitigation, applicable interest rates, and eligibility for the productivity bonus does not derive from a lack of sufficient data. Rather, it is a classic disagreement between competing experts about the interpretation of, and conclusions to be drawn, from the data available to both sides. Accordingly, based on the record before it, this court finds that PorterCare's objections are not to the methodology utilized by Dr. Bauer, but to his assumptions and conclusions. Though Defendant might not agree with the assumptions, this court finds them sufficiently reliable for the purposes of Rule 702. Defendant's criticisms go to the weight, rather than the admissibility, of Dr. Bauer's calculation of Dr. Jaffrey's loss of income and may be a proper basis for cross-examination, but are not a proper basis for exclusion. *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1249 (10th Cir. 2014) (affirming district court's admission of expert testimony that party challenged based on "inappropriately selected variables and benchmark years based on what would yield the greatest damages."); *see also A-W Land Co.,*

---

provides that a proponent of the opinion may only disclose facts or data that would otherwise be inadmissible if their probative value substantially outweighs their prejudicial effect. Fed. R. Evid. 703.

*LLC v. Anadarko E&P Co. LP*, No. 09-CV-02293-MSK-MJW, 2017 WL 4161278, at *3 (D. Colo. Sept. 20, 2017); *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, No. 11-CV-01468-WJM-BNB, 2014 WL 983507, at *7 (D. Colo. Mar. 13, 2014).

## II.     Consequential Harm and Hourly Rate

Defendant next seeks to exclude Dr. Bauer's opinions regarding consequential harm to Dr. Jaffrey's reputation and future employment opportunities, as well as the hourly rate applicable to any type of mitigation of future damages. Dr. Bauer opines that PorterCare improperly terminated Dr. Jaffrey in a manner that was inconsistent with its policies. [#70-1 at 5]. Dr. Bauer further opined that, because Defendant terminated his *locum tenens*, his reputation would suffer and he would have a difficult time securing comparable work in Colorado. [*Id.*]. During the evidentiary hearing, Dr. Bauer testified that he based these opinions on his decades of experience consulting in the healthcare field; advising clients with respect to the hiring and firing of physicians; his knowledge of the Colorado medical community; and the role of informal vetting through personal and professional relationships. Finally, Dr. Bauer opined that Dr. Jaffrey would be unable to return to private practice for a number of reasons but that he would likely be able to secure work as a consultant, albeit for a lower rate of $100 per hour as compared to his previous rate of $150 per hour as a *locum tenens* physician. [#70-1 at 5–6]. In support of the hourly rate, Dr. Bauer indicates in his report that he conducted a survey of hourly pay for physician consultants [*id.* at 6], which he further explained was also based on his "many years of experience dealing with physicians who earn consulting income." [#73-1 at ¶ 18].

Defendant takes issue with each part of Dr. Bauer's analysis, arguing that: (1) his assessment of "reasons for termination" is beyond his scope of expertise "to the point of attempting to enforce his own ideals as legal requirements," [#70 at 8–9]; (2) his opinions

regarding the professional repercussions of Defendant's actions towards Dr. Jaffrey in the Colorado job market are "wild speculation" [*id.* at 9]; and (3) his methodology used to calculate the rate of $100 per hour for a consulting physician was unreliable [*id.* at 11]. The court addresses each objection in turn.

*First*: After review of Dr. Bauer's opinions and testimony regarding PorterCare's termination of Dr. Jaffrey and its purported failure to follow certain internal procedures when doing so [#70-1 at 3–5], this court finds that Dr. Bauer's opinions are impermissible under Rule 702 for various reasons: the opinions are outside the area of his expertise as a health care economist; the opinions expressed will not help the trier of fact understand the evidence or determine a fact in issue; and any marginal relevance is simply outweighed by the potential for prejudice. Despite Dr. Bauer's experience as an economist and in the health care field, he has not been qualified to testify as an expert as to whether Defendant violated its internal human resource policy regarding the investigations of patient complaints, the best practices as to such investigations, or the repercussions for failing to follow such best practices.

More importantly, however, Dr. Bauer's opinions are simply not helpful to the trier of fact. Courts are charged with excluding evidence that "does not have sufficient bearing on the issue at hand to warrant a determination that it has relevant 'fit'." *Doe v. Bd. of Cty. Comm'rs of Payne Cty., Okla.*, 613 F. App'x 743, 746 (10th Cir. 2015) (citing *Butler*, 400 F.3d at 1234). Whether Defendant failed to follow its internal procedures or best practices in handling a patient complaint regarding Dr. Jaffrey has no bearing on whether PorterCare failed to hire Dr. Jaffrey because of his age, or whether it breached an oral employment contract with him, or whether Dr. Jaffrey reasonably relied upon Defendant's promises to his detriment. *See id.* (holding that the district court did not abuse its discretion when it determined that testimony about failure to

follow so-called best practices was not relevant to whether plaintiff was discriminated against based on a disability). Indeed, there are no allegations that Defendant breached any contract or reneged on a promise to follow certain procedures as to Dr. Jaffrey. Nor is there any established nexus between a failure to follow internal investigation procedures and age discrimination. Even accepting Dr. Bauer's opinion that the manner by which PorterCare terminated Dr. Jaffrey resulted in his inability to continue working as a *locum tenens* within the Colorado medical community, any marginal relevance is substantially outweighed by the danger of confusing or misleading the jury as to the issues of age discrimination and what contractual or quasi-contractual obligations PorterCare owed Dr. Jaffrey. *United States v. Call*, 129 F.3d 1402, 1405 (10th Cir. 1997) (observing that even if evidence meets the criteria of Rule 702, it must also "survive the rigors of Rule 403" which permits trial courts to exclude evidence when the probative value is outweighed by the danger of unfairly prejudicing, confusion of issues, or misleading the jury).

*Second*: As for Dr. Bauer's opinions regarding the effect of Dr. Jaffrey's termination to his reputation and employment prospects in the Colorado medical community, and the appropriate rate of pay for a consulting physician, Dr. Bauer relies heavily, if not solely, upon his experience as the basis of his opinions. Dr. Bauer's report and testimony pointed to no evidence of actual harm to Dr. Jaffrey's reputation or employment prospects but, rather, he based his opinions on his general knowledge of the practice of informal vetting in the medical community. In addition, Dr. Bauer conceded that he searched for, but could not find, any published surveys that reflected an average rate for a consulting physician. In both his deposition and his testimony at the evidentiary hearing, Dr. Bauer indicated that he conducted an informal survey of five or

13

six physicians and a director of research at a trade organization who had experience with consulting physicians to determine the $100 per hour rate.

Courts in this District have observed, "if the testimony is the product of only the witness' experience, the Comments following Rule 702 instruct that 'the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Heineman v. Am. Home Prod. Corp.*, No. 13-CV-02070-MSK-CBS, 2015 WL 1186777, at *3 (D. Colo. Mar. 12, 2015). Indeed, those same Comments provide, "[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." With these principles in mind, the court finds that Dr. Bauer may testify that, based on his experience, Dr. Jaffrey's employment prospects within the Colorado medical community might be adversely affected by his termination by Defendant from his *locum tenens* position because of the practice of informal vetting, but he may not testify as to what those physicians or program managers "will assume." [#70-1 at 4]. The generalization that physicians or program managers will assume that "the sudden termination of Dr. Jaffrey's employment resulted from either professional negligence or flagrant violation of professional behavior standards" is unsubstantiated by any evidence in the record, and is too speculative to satisfy this court's gatekeeping function. Nor will Dr. Bauer be permitted to opine as to whether Dr. Jaffrey's termination was "unfair", "unjustified", or "no fault of his own." As discussed above, Dr. Bauer is not qualified as an expert in the area of human resources, and his personal opinion about Dr. Jaffrey's treatment is outside his scope of expertise and any limited probative value is outweighed by the danger of prejudice. Ultimately, it is the jury's—not Dr. Bauer's— determination of fairness as to Defendant's treatment of Plaintiff that matters. Similarly, Dr.

Bauer will be precluded from characterizing Dr. Jaffrey's standard of professionalism and ethics as, again, those are outside his area of expertise and he is not appropriately offered as a witness to bolster Dr. Jaffrey's repute with the jury.

*Finally*: As for Dr. Bauer's opinion that the appropriate rate of pay for a consulting expert is $100, this court finds that Dr. Bauer's experience in the field of health care is sufficiently reliable to be admissible. Dr. Bauer disclosed his methodology of surveying health care providers in the Colorado market about the market rate for physicians after finding no formal study. Although he did not identify those individuals by name, occupation, or specific experience for the most part, the methodology is reasonably reliable for the purposes of Rule 702. Indeed, this court's own review of publicly available materials on the internet reveals a number of sources that discuss a fair market value for physician consultants performing a variety of different types of tasks. While Defendant can certainly challenge the rigor of, or conclusion drawn, from Dr. Bauer's informal survey, those criticisms are more properly directed at the weight, rather than the admissibility, of that opinion. *Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, No. 01-CV-01644-REB-CBS, 2010 WL 3522416, at *4 (D. Colo. Sept. 1, 2010).

### III. PorterCare's Compensation Plan

The court now turns to Dr. Bauer's last area of opinions regarding "Age Discrimination against Dr. Jaffrey in ACPHS' [sic] Contract Process." [#70-1 at 7]. Dr. Bauer opines that there was a 10% reduction in the conversion factor the day following a message from Maxwell Kagan stating that Dr. Jaffrey "will never hit the production levels necessary to support his income." [*Id.*]. Dr. Bauer testified that he concluded that this reduction in conversion rate reflects age discrimination on the part of Defendant based upon the correspondence between employees of Defendant and his calculations of conversion rates.

This opinion is problematic for a host of reasons and will not be permitted. First, at the core, there is no generally accepted methodology that Dr. Bauer identified that he and others in the field of health economics use to quantify or analyze whether particular economic decisions are driven by discriminatory intent. *See Heineman*, 2015 WL 1186777, at *8. Indeed, there is no reproducible method used by Dr. Bauer to determine whether or how discussions of productivity are equivalent to, or consistent with, age discrimination. There are also no facts or statistics regarding comparators to suggest that younger physicians outside of the protected class, who also were not anticipated to meet productivity goals, were offered better or different conversion rates or terms of employment by Defendant. Instead, Dr. Bauer testified that he gleaned discriminatory intent from the email correspondence between the decisionmakers [#70-1 at 9], and his interpretation of the unstated meaning behind the words of the correspondence.

During the evidentiary hearing, Dr. Bauer admitted that there was no scientific method to his reading of the correspondence, and he admitted the correspondence was not clear. Further, in his Declaration, Dr. Bauer attests that he "concluded that the words and reasoning they used are *consistent with* age discrimination," and clarified that he "did not make a legal argument that they *prove* age discrimination." He cites no objective basis for concluding as he does in his Declaration that "[i]t is more likely decision makers at PCAHS concluded, based on their age-related stereotypes, that Dr. Jaffrey would not hit his productivity targets and that therefore his conversion factor should be lower than the one used for other, younger physicians." [#73-1 at ¶ 21].

As previously noted, this court is charged as a gatekeeper to ensure that expert testimony admitted is not only relevant but also reliable, and looks to facts underlying the opinion, the methodology, and the link between the facts and the conclusions drawn. Upon review of the

16

record before it, the court finds that Dr. Bauer's opinions regarding any discriminatory intent by Defendant are speculative, not supported by any reliable data or information, are not helpful to the trier of fact, and present a significant danger of confusing or misleading the jury. Accordingly, Dr. Bauer will not be permitted to testify to any opinions as set forth in Section 3 of his Report, regarding his conclusion that the final salary offer to Dr. Jaffrey is biased downward due to a concern with Dr. Jaffrey's age.

## CONCLUSION

For the reasons set forth above, **IT IS ORDERED** that:

(1) Defendant's Motion to Exclude Testimony of Jeffrey Bauer [#70] is **GRANTED IN PART and DENIED IN PART**, consistent with the direction herein.

DATED: November 22, 2017

BY THE COURT:

s/ Nina Y. Wang
United States Magistrate Judge